#### WHETSTONE *ET AL.* v. DREHER *ET AI.*

#### (136 S. E., 209)

1. TRIAL—TRIAL COURT PROPERLY IMPANELED JURY TO TRY LEGAL ISSUES, IN ACTION TO CANCEL DEED FOR FRAUD, WHERE ANSWER ALLEGED PARAMOUNT TITLE.—Where answer in action for cancellation of deed for fraud did not admit allegations of complaint, but alleged paramount title in defendants, impaneling of jury by trial court for purpose of trying legal issues raised *held* not error.

2. TRIAL—ORDER OF TRIAL OF LEGAL AND EQUITABLE ISSUES IS IN DISCRETION OF TRIAL JUDGE.—Whether legal or equitable title shall be first tried is in discretion of trial·judge.

3. TRIAL—TRIAL COURT HAS AUTHORITY ON HIS OWN MOTION TO FRAME ISSUES.—Trial Court has authority without consent of parties and on his own motion to frame issues.

4. APPEAL AND ERROR—PLAINTIFF CANNOT COMPLAIN OF COURT'S IMPANELING JURY TO TRY APPARENT LEGAL ISSUE, WHERE CASE WAS FINALLY DISPOSED OF AS EQUITABLE ISSUE.—Where case was finally disposed of as one of purely equitable cognizance as was contended for plaintiffs in first instance, they cannot complain on appeal of trial Court's impaneling jury to try what then appeared to be legal issue.

5. TRIAL—TRIAL COURT, ON FAILURE OF JURY TO AGREE AS TO SPECIAL ISSUES SUBMITTED IN EQUITY CASE, WAS NOT REQUIRED TO ORDER MISTRIAL.—Where jury failed to agree after submission of issues in equity case, refusal of trial judge to order mistrial was not error, since Court was not bound to accept jury's verdict, and it was within his discretion on their failure to agree to decide case himself or to defer to some future term.

6. APPEAL AND ERROR—APPELLANT CANNOT COMPLAIN OF TRIAL JUDGE'S FAILURE TO ORDER MISTRIAL WHERE COUNSEL IN REPLY TO REQUEST

STATED IT WAS IN COURT'S DISCRETION.—Appellant cannot complain of trial Court's failure to order mistrial on jury's failure to agree after submission of issues in equity case, where in reply to Court's request counsel stated Court might in its discretion defer case or dispose of it as he saw fit.

7. APPEAL AND ERROR—APPELLANTS MUST SHOW THAT FINDINGS OF LOWER COURT IN EQUITY CASE ARE AGAINST PREPONDERANCE OF EVIDENCE.—If reversal is to be had on findings of fact in equity case, appellants must show on appeal that findings of lower Court are against preponderance of evidence.

8. APPEAL AND ERROR.—INSTRUCTION, IF ERRONEOUS, HELD HARMLESS, WHERE NO VERDICT WAS RENDERED BY JURY.—Instruction on fraud in equity case, if erroneous, *held* harmless, where no verdict was rendered by jury on issues submitted.

9. EVIDENCE—IN ACTION TO CANCEL DEED FOR FRAUD, TESTIMONY OF WITNESS WHO HAD TALKED WITH AND OBSERVED GRANTOR, RELATIVE TO HIS MENTAL CONDITION HELD PROPER.—In action for cancellation of deed on ground that it had been procured through fraud and undue influence, witness, after testifying relative to talking to and observing grantor shortly after conveyance, was properly permitted to state grantor talked intelligently and seemed to be perfectly conscious of what was going on.

10. APPEAL AND ERROR—EXCEPTIONS NOT ARGUED WILL BE CONSIDERED ABANDONED.—Exceptions which are not argued by counsel for appellants are to be considered as abandoned.

Before JOHNSON, J., Lexington, March, 1925.   Affirmed.

Action by Maggie Young Whetstone and others against C. E. Dreher and another.   Decree for defendants, and plaintiffs appeal.

The decree of Judge Johnson is as follows:

"The plaintiffs brought this suit in the Court of Common Pleas of Lexington County on or about the 1st day of August, 1924, to set aside a deed from L. L. Hendrix to the defendants of date the 26th of May, 1922, alleging, among other things, that at the time of the execution of said deed the said L. L. Hendrix was afflicted with Bright's disease, high blood pressure, arteriosclerosis, paralysis, mental derangement, senile imbecility, mental weakness, incompetency, and other weaknesses and mental disorders; that he was insane, crazy, and did not know what he was doing at the time of the

execution of the deed in question; that said deed was without consideration, was procured from Hendrix by false pretenses of affection, love, and kindness; that the defendant had thereby perpetrated a palpable fraud on Hendrix in procuring said deed. They also allege that they were the owners and holders of the lands and premises described in the second paragraph of their complaint and were entitled to the immediate possession of the same as heirs at law and next of kin of him the said L. L. Hendrix, and asked that they be adjudged the owners of said premises, for $500 rents and profits therof, and $1,000 damages for the illegal withholding of said premises from them. To this complaint the defendants filed an answer denying each and every allegation thereof, and for further defense alleged that they were the owners in fee simple of the premises described in the complaint and were in the lawful and rightful possession thereof.

"Before the filing of the answers of the defendants they served on counsel for plaintiffs a notice that they would move the presiding Judge of the Court of Common Pleas for an order requiring the plaintiffs to make their complaint more definite and certain in the following particulars, to wit, first, by alleging in what county or state or other political subdivisions they were citizens and residents of; second, by alleging how they were related to the deceased, L. L. Hendrix, and especially, if they did not claim to be descendants or antecedents, through what collateral they claimed relationship with him; and, third, by alleging what were the false pretenses, affections of love and pretended kindnesses, and what other fraudulent considerations and pretenses the defendants used and practiced on and towards the said L. L. Hendrix to procure the written deed referred to in the second paragraph of the complaint. The motion was heard by Judge Ramage, special Judge, at the September term of the Court in 1924, who filed an order requiring the plaintiffs to make more definite and certain so much of the complaint as alleged, and other fradulent considerations and pretenses

on the part of the defendants to the said L. L. Hendrix,' by stating what the other fraudulent considerations and pretenses were, and the order further provided that in case they failed to so amend their said complaint within specified time the said words be stricken out of the complaint. The case was docketed on both calendars 1 and 2, and when the case was called for trial plaintiffs' counsel contended that it was an action to set aside a deed and purely an equitable case and should be referred to a referee. Counsel for the defendants stated that at the meeting of the Lexington Bar for the purpose of setting down the cases to be tried by a jury at the March term of the Court of Common Pleas, the attorneys for the plaintiffs had this case placed on the roster, insisting that it should be tried; that there was no need of a reference; that the case had been on the calendar for some time and ought to be tried; and that their answers raised a question of title and they insisted upon a trial of the case. Upon an inspection of the pleadings I held that it was a suit in equity to set aside a deed because of the alleged fraudulent procurement thereof, but as the answer raised legal issues, I decided to impanel a jury and proceeded with the trial of the case, announcing that the Court would try the equity issues and the jury the legal issues if any should develop during the progress of the trial.

"The plaintiffs introduced several witnesses who testified in substance as follows: That L. L. Hendrix had received a stroke of paralysis on the 25th day of May, that his physical condition was pretty bad and at other times it improved somewhat, that his mouth and left eye were drawn to one side and he had a kind of wild expression in his eyes, that when asked questions he would answer 'Yes' or 'No' and his answers were sometimes right and sometimes wrong, but none of them would say that he was so incapacitated as not to know his friends or the object of his bounty. Several of the witnesses for the plaintiffs testified that when Hendrix was 18 or 20 years of age he moved to the residence of Mrs. Dreher, the grandmother of defendants, and lived

with her until her son, Walter Dreher, the father of defendants, was married, and then he removed to the residence of defendants' father and lived with him until about the time he married defendants' aunt, who was a sister of their father, Walter Dreher; that the second tract of land described in the complaint belonged to Mrs. Hendrix, the wife of L. L. Hendrix and the aunt of the defendants, and that by her last will and testament she gave the property to her husband, the said L. L. Hendrix. The witnesses living in the immediate neighborhood of L. L. Hendrix admitted that the plaintiffs were unknown to them and had never visited L. L. Hendrix within their knowledge. Pierce Thornton, one of the plaintiffs' witnesses, testified that the last words uttered by the deceased was to call for one of the defendants. Plaintiff also introduced testimony to show that they had heard Hendrix, the deceased, say some years prior to his death he did not intend to give any of his property to the defendants, and one or more of the same witnesses testified that they had heard him say at other times that he intended to give them all of his property. One of the witnesses, G. M. Adams, testified that after the death of Hendrix's wife, and while Hendrix was around looking for a wife, he had heard him say he did not intend for the Dreher boys to get his property, and that Hendrix wanted the impression to get out that if he got married his wife would get his property. The uncontradicted testimony is that Hendrix never married after the death of his wife and never had any children, and the greater portion of his property came from his wife, the aunt of the defendants. The plaintiffs also introduced in evidence the deed from L. L. Hendrix, of date the 26th day of May, 1922, conveying the property mentioned and described in the second paragraph of the complaint to the defendants.

"At the conclusion of plaintiff's testimony the defendants placed on the stand Ira C. Carson, who testified that he had prepared the deed in question at the request of the defendant C. R. Dreher, who furnished him with the deeds which L.

L. Hendrix had describing the two tracts of land in the complaint; that he, Altman, and Garber had gone to the residence of Hendrix with one of the defendants on the 26th day of May, 1922; that on arriving at Hendrix's residence they went into the house; that Hendrix was dressed and came out of an adjoining room into a room where they were; that defendant Dreher introduced them to Hendrix and left the room; that he read the deed over carefully to Hendrix, asked him if he understood the deed, what he desired to do with his property, and carefully explained everything connected with it; that Hendrix told him while sitting on the bed with his feet resting on the floor he understood all about it and desired to give his property to the Dreher boys; that Hendrix fully understood what he was doing and in his opinion his mind was sound, and he saw no evidence of insanity or incapacity; and that no undue influence whatever was exerted or used to procure his signature to the deed, and in this he is fully corroborated by Altman and Garber. In addition to this Dr. D. M. Crosson, a reputable physician, residing in the county, testified he had known Hendrix for 40-odd years and had seen him after his last illness; that his mind was perfectly sound; that he had told him six months before in the presence of all of his family he intended to give all his property to the defendants, and after the deed was executed, while he was at Hendrix's residence, Hendrix stated to him that he had executed a deed giving all of his property to the defendants. Mr. and Mrs. Colie Long testified that they had visited Hendrix after his last illness and they considered his mind perfectly sound. T. H. Shull, who is a member of the Legislature of Lexington County, testified that he had known Hendrix for a number of years; that Hendrix was a member of his church, and on Sunday after Hendrix had received the stroke of paralysis and two days after he had executed the deed in controversy he and the pastor of Hendrix's church, had gone to see him, and had had a conversation with him, and he considered his mind perfectly sound. He also stated that a

year or two before Hendrix had died he had tried to buy a lot of timber from him on the second tract of land described in the complaint, and that Hendrix had told him he did not care to sell it as he intended for the defendants to have his property.

"At the conclusion of this testimony I stated to the jury that there were no legal issues to be submitted to them, but on my own motion I sent out certain questions of fact or inquiry merely for the enlightenment of the conscience of the Court, although I then stated that my personal conviction was that I had a right not to send it out for my enlightenment and had the right to disregard the findings of the jury in setting aside the verdict if it did not meet with my approval. When the jury failed to agree on the questions submitted to them that it appeared to the Court that it would be more or less a waste of time to try the case over, and that from a selfish standpoint the Court would rather not decide the case. I also stated that I was frank to say that while it may have occurred a number of times I had never seen a similar case and I never thought that there could be a mistrial on an equity case. Certainly the jury could fail to agree on the issues of fact which were submitted to them for the enlightenment of the conscience of the Court, but if the Court did not act, the question in my mind was whether the Court would not be shifting the responsibility.

"I then told counsel that I would prefer to hear from them and have them express their views as to whether or not I should decide the case, whereupon Mr. Asbill, counsel for the plaintiffs, said:

" 'So far as the discretion of your Honor is concerned, we have nothing to do with that. I think under the broad authority of a Judge in an equity matter that it is a matter of your Honor's discretion as to whether or not you will take up the matter. It seems to me that this is the equity Court. If your Honor saw fit you could defer this case until our next term of Court, or your Honor could take it. It is a case you could dispose of without a jury; you do not have to

submit it to a jury; it is just a matter of whether your Honor, as I see it, whether your Honor considers it is your duty under the facts to dispose of it now or defer it until our next term of Court. I am satisfied that it is a matter of your Honor's discretion, and if the Court would prefer to wait and try the case over by a jury I do not believe any Court would question your right or authority to do that. It is a matter for the conscience of the Court; it is a matter that appeals to right and wrong in the mind of the Court; and I am satisfied that you have the authority to do either one or the other, and as to what you should do, that is a matter I have nothing to say, as I have absolute faith in your Honor's discretion and conscience in the matter.'

"Mr. Timmerman: 'So far as we are concerned, in view of the ruling made by the Court and which it is unnecessary for me to repeat as your Honor is familiar with everything that has transpired in the case, it strikes me that this case has resolved itself and finds itself in the position of nothing but equitable issues. As your Honor has stated, I do not recall a case just exactly in this situation, and certainly I have never been engaged in one where I found it just in this situation, and while I have made no investigation of the authorities to look for a like situation, it seems to me that there can be no mistrial in an equity case.'

"I then announced that it was purely an equitable case, and that the issues involved were exclusively for a Court of Equity, and that the jury has nothing to do with it; that if the jury had not already been impaneled or heard the testimony, I would not have thought of sending it to them, as the issues were purely for the Court; that my conviction was that in questions of fraud such matters should be tried without the aid of a jury, as jurors are so easily and, I might say, unconsciously so, led astray and confused over the issues in an equity case, was not for the enlightenment at all, but for a support of my conclusions, and if the jury's findings do not agree with my opinion I would set them aside and disapprove of them. I also stated that in the admin-

.istration of justice and for the purpose of ending litigation, I felt that I should decide this case, because I saw the witnesses and heard their testimony and the argument of counsel and was in a better position to pass upon the issues in this case than I would have been had the case been referred to a referee to take the testimony and come before me on the testimony taken by the referee, and I felt that I would be evading a responsibility which I should discharge where I do decline to pass upon the issues in the case. I then decided the case in favor of the defendants, giving my reason for doing so, and stated that my views would be expressed more at length in a regular decree to be filed thereafter.

"I was very much astonished at the inability of the jury to agree, as I never heard a case which to my mind was more convincing of the lack of fraud than in the instant case. One thing which struck me very forcibly was that if the defendants in the case were guilty of fraud then the notary public, Mr. Carson, and the witnesses Altman and Garber were guilty of fraud, and there was nothing, not even an intimation in any respect, that these men were not men of the highest type of character. Their appearance on the stand was certainly impressive and impressed the Court with the truth of their statement, and the testimony of the witness Carson particularly showed that he was exceedingly careful in his efforts to ascertain from the grantor whether or not he fully understood what he was doing and appreciated the consequence of his act. I think he is to be commended for having propounded the inquiries to the grantor that he did. The defendants clearly proved that there was no fraud in procuring the deed in question from Hendrix; they established beyond question that the grantor became, as he expressed it, peeved, and finally with a wave of the hand, said, 'I want to give those boys everything I have got'; and in this statement he was corroborated by the other subscribing witnesses to the deed. The overwhelming weight of the testimony in the case plainly shows that L. L. Hendrix, the grantor, knew what he was doing at the time he executed

the deed in question, knew his property and the object of his bounty, for the witnesses Carson and Altman and Garber say that after they had entered the house Hendrix came out of another room dressed, was introduced to them, sat down on the bed, and told them what disposition he desired to make of his property, and these witnesses were neither related to the grantor or grantees and had no interest in this case, and the testimony fully satisfies the Court that no imposition, undue influence, or fraud was practiced upon the grantor by the defendants or anyone else in procuring the deed in question.

"I conclude, therefore, that L. L. Hendrix was of sound mind at the time he executed the deed to the defendants, that he knew what he was doing, knew his property, the object of his bounty, knew he was conveying all his property to the defendants, that the deed in controversy is a good valid deed, that no fraud, undue influence, or imposition was practiced upon Hendrix by the defendants in procuring his signature to said deed, and that the defendants are the owners in fee simple of the premises described in the complaint, and are in the lawful and rightful possession thereof.

"'Whereof it is ordered and adjudged that the plaintiffs' complaint be dismissed, and that the defendants have judgment against the plaintiffs for their costs and disbursements."

*Mr. E. L. Asbill,* for appellants, cites: *Whether deed procured by fraud is equitable question:* 11 S. E., 1075. *Court erred in refusing to allow reference:* 132 S. C., 416; 121 S. C., 338; 113 S. C., 493; 85 S. C., 299; 67 S. E., 297; 75 S. C., 105; 55 S. E., 156. *Refusal to allow compulsory reference reviewable when based on erroneous conception of law:* 47 S. C., 488; 25 S. E., 797. *Issues of fact may be tried by jury in equity case; force of verdict:* Code Civ. Proc., 1922, Sec. 533. *Appellant jurisdiction of Supreme Court in equity cases:* Const. 1895, Art. 5, Sec. 4. *Bright's disease and hardening of arteries as cause of mental deterioration:* 132 S. C., 390; 126 S. E., 764. *Undue influ-*

*ence on person extremely weak ground for setting aside contract:* 117 S. C., 450; 87 S. C., 5. *Proof of weak-mindedness, or extreme physical weakness, of grantor, where consideration small, throws burden on grantee of showing transaction bona fide:* 106 S.C., 328; 91 S. E., 328; 57 S. C., 413; 52 S. E., 666; 35 S. E., 854; 4 DeSeaus. 697; 3 DeSaus, 273; 19 L. R. A. (N. S.), 461; 1 Story Eq. Jur., Secs. 221, 235 and 238; 12 R. C. L., 232. *Fraud:* 12 R. C. L., 229.

*Messrs. Callison & Barr* and *Martin & Sturkie* also for appellants.

*Messrs. Timmerman & Graham,* for respondents, cite: *Court properly allowed determination of legal issues by jury and equitable issues by himself:* 107 S. C., 248; 103 S. C., 305; 80 S. C., 262; 78 S. C., 193; 76 S. C., 509; 70 S. C., 284; 62 S. C., 463; 61 S. C., 5; 49 S. C., 354; 43 S. C., 364; Code Civ. Pro., 1922, Sec. 533. *Submission of issues of fact in equity case to jury discretionary with Court:* 82 S. C., 150; 27 S. C., 48. *Same; Court need not follow verdict:* 21 S. C., 401; 12 S. C., 53; 11 S. C., 445; 9 S. C., 147; 6 S. C., 209. *Same; where complaint is on legal right but defense raises equitable issues:* 70 S. C., 344; 28 S. C., 369; 27 S. C., 623; 12 S. C., 97. *Counsel having agreed to ruling of Court cannot later object:* 133 S. E., 27. *Find-ings of fact in equity case by Court final unless against pre-ponderance of evidence:* 92 S. C., 113. *Admissibility of evidence of near neighbor and friend as to mental condition of deceased:* 95 S. C., 14; 74 S. C., 236; 72 S. C., 259; 72 S. C., 269; 67 S. C., 363; 62 S. C., 292; 61 S. C., 337; 59 S. C., 311. *Relevancy of evidence matter for discretion of Court:* 111 S. C., 375; 98 S. C., 121; 88 S. C., 302.

January 3, 1927.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

An action for the cancellation of a deed executed by one L. L. Hendrix in favor of the defendants, and for judg-

ment against the defendants in the sum of $500 for rents and profits, and for the sum of $1,000 for trespass. The decree of Judge Johnson, which will be reported, states fully the facts, history and nature of the controversy.

When the case was called for trial counsel for the plaintiffs moved for an order of reference, on the grounds that the case was one of purely equitable cognizance, in that it was alleged that the deed in question was a fraudulent one and had been procured by the defendants through fraud, deceit, and undue influence, the grantor, Hendrix, being mentally incapacitated at the time. The Court overruled the motion, giving the following reasons:

"It appears that the case was originally docketed on calendar 2 of this Court in September, 1923, and that it remained on such calendar until the fall, 1924, term of Court, when it was ordered transferred to calendar 1 by his honor, H. F. Rice, presiding Judge.

"It does not appear that any formal order to transfer the case to calendar 1 was ever signed by Judge Rice, but the minute entry upon calendar 2 directing the clerk to transfer it to calendar 1 is the handwriting of Judge Rice.

"It appears further from the complaint that several or at least two causes of action are united therein, though not separately stated, and the prayer for relief set out: (1) Plaintiffs pray that they may be adjudged the owners of the lands and premises described in the complaint and entitled to the immediate possession of the same; (2) that the alleged and purported deed named therein be ordered delivered up and canceled of record and destroyed; (3) that these plaintiffs have judgment against the defendants for the full and just sum of $500, rents and profits for said land, and further for the sum of $1,000 for the illegal holding and trespassing on said lands.

"In the answer the defense pleads: (1) A general denial; and (2) title in themselves, the second defense being in the following language: 'For a further defense and further

answering said complaint these defendants say that they are
the owners in fee simple of the premises described in said
complaint and are in the lawful and rightful possession
thereof.'

"It will be observed that the answer of the defendants
admits none of the allegations of the complaint, and the de-
fense of title does not admit or show that the defendants
are claiming the title under the deed alleged in the complaint
to have been made to them by Mr. L. L. Hendrix, for the
alleged fraud in the procurement of which the plaintiffs ask
that the same be set aside. In other words so far as the
Court is able to determine from the pleadings, the defense
in the second defense may be relying upon paramount title,
and not merely or in any event upon the deed mentioned and
referred to in the complaint.

"It seems to the Court that the complaint contains both
legal and equitable causes of action, and that the answer
sets up purely legal defenses, namely, a general denial and
paramount title. The Court is aware of the fact that in the
case of *Du Bose v. Kell,* reported in 76 S. C., 313; 56 S. E.,
968, which was an action to cancel a deed and the action
of the Circuit Judge in requiring that the equitable issues
of fraud be first disposed of was sustained by the Supreme
Court, but the decision in that case seems to rest upon the
principle that a decision upon the equitable questions of
fraud would have determined the real issues in the case, and
by its language the Court intimates, if it does not actually
decide, that if the defense in that case had been paramount
title it would have been proper to dispose of the legal issues
first.

"In the Kell Case while the defense pleaded title in them-
selves, such title was based upon and founded upon the
very instrument which the plaintiff sought to have canceled
for fraud, and this Court in the instant case, would, if the
plea of title set up by the defense in their second defense
was by the pleadings shown to have been based or founded

upon the deed mentioned in the complaint, order the equitable issues of fraud first to be disposed of.

"The Court is of the opinion, however, that under the state of pleadings, the defense would be entitled to show, if they can, paramount title in themselves, which if done, would dispose of the equitable issues of fraud in the procurement of the particular deed mentioned in the complaint."

The appellants by their first exception impute error to the trial Judge in refusing to refer the case, and in holding that there were legal issues to be submitted to a jury, contending that the case involved only equitable issues and that "the case was so jumbled and mixed in the trial that the rights of the appellants were jeopardized and prejudiced thereby."

As stated by the trial Judge, the answer of the defendants did not admit any of the allegations of the complaint, nor did it allege that the defendants were claiming title under the deed which the plaintiffs were seeking to set aside; and as it appeared that the defense set up was that of paramount title, it was proper that such issue of title should be first submitted to the jury in order that this issue might be settled, for if settled in favor of the defendants, the trial of equitable issues would become unnecessary. We see no error on the part of the Circuit Judge in impaneling a jury for the purpose of first trying any legal issue raised by the pleadings.

In *Windham v. Howell,* 78 S. C., 187; 59 S. E., 852, the Court said:

"When defendant's answer raises an issue of paramount title to land, such as would, if established, defeat plaintiff's action, it is the duty of the Court to submit to a jury the issue of title as raised by the pleadings. *McGee v. Hall,* 23 S. C., 392. *Sale v. Meggett,* 25 S. C., 72. *Reams v. Spann,* 28 S. C., 533; 6 S. E., 325. *Carrigan v. Evans,* 31 S. C., 265; 9 S. E., 852. *Capell v. Moses,* 36 S. C., 561;

15 S. E., 711. *Bank v. Peterkin,* 52 S. C., 236; 29 S. E., 546; 68 Am. St. Rep., 900. *Tyler v. Williams,* 53 S. C., 375; 31 S. E. 298. *Barnes v. Rodgers,* 54 S. C., 123; 31 S. E., 885."

In *Land Co. v. Myers,* 70 S. C., 282; 49 S. E., 848, we find (quoting syllabus) : "Whether legal or equitable issues shall be first tried is in the discretion of the trial Judge." See, also, *Bratton v. Power Company,* 80 S. C., 260; 60 S. E., 673. *Du Bose v. Kell,* 76 S. C., 313; 56 S. E., 968. *Alston v. Limehouse,* 61 S. C., 1; 39 S. E., 192. *Knox v. Campbell,* 52 S. C., 461; 30 S. E., 485. *Greenville v. Ormand,* 44 S. C., 119; 21 S. E., 642.

And even though, as it turned out from the testimony, there was no legal issue to be passed upon by the jury, we cannot see in what way the appellants' rights were prejudiced or jeopardized by the procedure followed. This exception is overruled.

When all the testimony was in, the trial Judge reached the conclusion that the testimony made no legal issues for the jury but that the matter was one entirely in equity and for determination by the Court itself. However, upon his own motion and for the aid and enlightment of the Court, he framed issues and submitted them to the jury. By their second exception the appellants complain of error on the part of the trial Judge in so doing, contending that they "were entitled to have the equitable issues in this case tried unmixed with legal issues."

The procedure followed by the trial Judge in impaneling a jury to try what then appeared to be a legal issue, reserving the equitable issues for trial by the Court, was in accordance with the contention of the appellants to have the equitable issues tried unmixed with legal issues. That the Court had the authority, without the consent of the parties and on his own motion, to frame issues is a well-established principle of law. *Mitchell v. Hamilton,*

98 S. C., 289; 82 S. E., 425.  *Brownlee v. Martin,* 21 S. C., 392.  *Flinn & Hart v. Brown,* 6 S. C., 209.

And further, it does not appear that the appellants should be heard to complain as the case was finally disposed of as one of purely equitable cognizance, as was contended for by them in the first instance.  There was no error on the part of the circuit judge.

Appellants contend by their third and twenty-seventh exceptions that when the jury failed to agree the Trial Judge erred in not ordering a mistrial or deferring the case to some future term of the Court, and that when issues in such a case are once submitted to the jury, the weight of a jury's verdict should be had before a decision is reached by the Court itself.  We do not agree with this contention.  In the first place, the Court need not have submitted issues to the jury, and neither party could demand the submission of issues as a matter of right.  In the second place, the Court was not bound to accept the verdict of the jury in making up his decision as to the judgment to be rendered in the case.  *Newbold v. McCrory,* 103 S. C., 299; 87 S. E., 542, 1103.  The verdict of the jury in such a case, as we have stated, is only for the aid and enlightenment of the Court.  For the Court to accept the verdict of the jury and to base judgment upon that solely and alone, would even be reversible error.  "The judgment in such a case must be the result of the conclusions of the Judge, both on the law and the facts."  *Gadsden v. Whaley,* 9 S. C., 147; *Sloan v. Westfield,* 11 S. C., 445.

It was in the discretion of the Court, when the jury failed to reach a verdict, to decide the case himself upon the testimony heard, without the aid of the jury or to defer the case to some future term of the Court.

There is an additional reason why appellants should not now be heard to complain.  When the jury failed to agree upon a verdict, the Trial Judge asked the counsel for both parties what would be proper for the Court to do under the circumstances.  In reply thereto,

counsel for the appellants stated that in his opinion it was a matter for the Court's discretion, and that the Court might defer the case to some other term, or dispose of it as he saw fit. These exceptions are overruled.

By numerous exceptions the appellants, in varying form, impute error to the Trial Court in finding and holding that the execution of the deed in question by the grantor was a voluntary act, that the deed was a valid one, and that at the time of its execution the grantor was not so infirm or mentally incapacitated as to render him unable to understand the subject and contents of the deed, its nature and the consequences, and the subject of his bounty, in failing to hold and find that the grantor, at that time, was so mentally incapacitated as to render him easily deceived and defrauded, and in not holding that the said deed was procured by the fraudulent acts of the defendants, and that in obtaining same the defendants practiced fraud, deceit, and undue influence, and exercised false pretenses of affection and love and pretended kindness.

The decree of the Trial Judge shows that he gave careful consideration to the testimony taken in the case. The witnesses were all before him and he saw and heard them and was able thereby to draw a just and correct conclusion from the testimony adduced. We have carefully examined the voluminous record and have made a study of the testimony, and are led to conclude that the Circuit Judge was correct in his findings. If reversal is to be had on findings of fact in a case of this kind, the appellants must show upon appeal that the findings of the Court below are against the preponderance of the evidence. *Taylor v. Jackson,* 92 S. C., 113; 75 S. E., 275; They have failed to show this. All exceptions raising these questions are overruled.

By their twenty-third exception the appellants complain that the Circuit Judge, in his charge to the jury, erred in his definition of fraud. This exception cannot be sustained for two reasons: First, as no verdict was

rendered by the jury on the issues submitted by the Court, the charge complained of, if erroneous, was harmless; and, second, the definition substantially included the law applicable to the evidentiary facts of this case.

Exception 25 imputes error to the Trial Judge in allowing Shull, a witness for the defendants, to give his opinion of the mental condition of the grantor, Hendrix, when he visited him on the first Sunday in June, 1922. It appears further from the testimony that the witness, in company with his pastor, visited the grantor at the time named, which was two days after the deed was executed, had a talk with him, and had opportunity to observe his actions and general condition, both physical and mental. The witness stated these facts in his testimony, and the Court then allowed him to say what he thought of the condition of the grantor · at that time, and he stated that the grantor talked intelligently and seemed to be perfectly conscious of what was going on. We do not think the admission of this testimony was error. 22 C. J., 599; *Jones on Evidence* (2d Ed.), 456. Further, even if its admission was error, it was harmless, as, under all the other testimony adduced on this point, the Trial Judge could have reached no other conclusion than he did reach as to the grantor's mental condition. See *Lowe v. Ottaray Mills,* 93 S. C., 420; 77 S. E., 135.

The appellants indicate in the record that their exceptions are 28 in number, but exception 18 is not incorporated therein. Exceptions not herein specifically considered by the Court were not argued by counsel for the appellants, and are to be considered as abandoned. However, an examination of these exceptions discloses that they are without merit.

All exceptions are overruled, and the judgment of the Circuit Court is affirmed.

Messrs. Justices Watts, Cothran, and Blease and Mr. Acting Associate Justice Ramage, concur.